GUARÁNTY TRUST CO. OF NEW YORK v. CHICAGO UNION TRACTION
CO. et al. (three cases).

(Circuit Court, N. D. Illinois, E. D.   August 12, 1907.)

Nos. 26,727–26,729.

STREET RAILROADS—FORECLOSURE OF LIENS—POWER OF COURT TO LEASE PROPERTY.

Various street railroad properties in the city of Chicago owned by different companies, and covering a large portion of the city, were, by a succession of leases, transferred into the possession of a single company which operated the same as one system. Such company and its preceding lessees had largely replaced the property and equipment of the original companies and extended the lines, the whole being subject to successive liens created by the different companies. The final lessee becoming insolvent, creditors' suits were instituted in which all the parties interested in the property were eventually brought in as parties, and the court took possession of the property by its receivers. At this time the franchises granted by the city to the several companies to operate their lines in the streets had largely expired, and those remaining had but short terms to run and the city refused to extend the same, leaving practically only the physical property at the disposition of the court, the value of which was much less than the indebtedness. In such condition of affairs the city passed an ordinance granting a franchise to a reorganized company for 20 years on certain conditions, among which were that it should retain possession of all the property in the hands of the receivers, should replace, repair, and re-equip the same as necessary to give an improved service, and operate all the lines as a single system. All except a few creditors and stockholders having small interests having approved of such reorganization scheme. *Held* that, in view of the great benefit which would result from it to the creditors and stockholders as a body by giving the property value as a going concern as well as to the public, the court had power to authorize its receivers to transfer the property by lease or otherwise, and on such terms as should be equitable to all, to the reorganized company for the term of its franchise, and to authorize such company to create a first lien on the same to obtain the money necessary to comply with the requirements of the ordinance.

In Equity.  Bills by the Guaranty Trust Company of New York against the Chicago Union Traction Company and others against the North Chicago Street Railroad Company and others and against the West Chicago Street Railroad Company and others.

In each of these causes the Chicago Railways Company (hereinafter called the "Railways Company") on the 15th day of July, 1907, filed its petition asking that the court order its receivers therein to deliver to the petitioner full and lawful possession of all the lines of street railway operated by the receivers of the Chicago Union Traction Company on February 1, 1907, with all the plant and equipment in use on or in connection therewith at the time of such delivery, in order thereby to enable the Railways Company to accept and comply with an ordinance of the City of Chicago, passed February 11, 1907, as amended, (hereinafter called "the Ordinance"). The declared purpose of the Ordinance was to provide for the reconstruction, re-equipment and extension of such street railway system and for the unified operation thereof, together with the street railway system maintained and operated by the Chicago City Railway Company (hereinafter called the "City Company"), to which another and substantially like ordinance was granted at the same time, and also to provide that the City of Chicago might be in a position, as soon as practicable, freely to deal with the subject of transportation in its streets as a whole and to fix and determine the definite terms and conditions upon which said City should have the right to purchase and take over, at any time, said street

railway system. The Ordinance made it a condition precedent to the right to accept it, that the Chicago Railways Company, at or before the time of accepting the Ordinance should be in lawful possession of the Traction Company's said system with power and authority to comply with the provisions of the Ordinance with respect to the operation, maintenance, extension, reconstruction, re-equipment and improvement of said railways, and to make from the receipts thereof all the deposits and payments required by the provisions of the Ordinance to be made from such receipts and with power to transfer to the City, or its licensee, all such possession, rights and powers in accordance with the provisions of the Ordinance in that behalf.

The Chicago River divides the City into three parts, known as the North, South and West divisions. That part lying north of the main channel of the Chicago River and between the north branch thereof and the lake is the North Division. That part lying south of the main channel of the River and between the south branch thereof and the lake is the South Division. That part between the north and south branches of the River is the West Division.

The surface street railway lines in the South Division, except terminals of lines from the North and West Divisions, are those operated exclusively by the City Company and are not here directly involved. The lines from each of the three divisions use that part of the South Division between Van Buren Street and the Chicago River in order to reach the congested part of the City.

The companies directly involved herein, owning or operating the surface street railway lines and property appurtenant thereto in the North and West Divisions and the tunnel and other property used in connection therewith, are the North Chicago City Railway Company (hereinafter called the "North City Company"); the North Chicago Street Railroad Company (hereinafter called the "North Street Company"); the Chicago West Division Railway Company (hereinafter called the "West Division Company"); the West Chicago Street Railroad Company (hereinafter called the "West Street Company"); the Chicago Passenger Railway Company (hereinafter called the "Passenger Company"); the West Chicago Street Railroad Tunnel Company (hereinafter called the "Tunnel Company"); the Chicago Union Traction Company (hereinafter called the "Traction Company").

Each of said companies (except the Tunnel Company) for a number of years has been a street railway corporation organized under the laws of Illinois, owning certain portions of the surface street railway lines covered by the Ordinance.

Prior to June 1, 1899, the North Street Company and the West Street Company operated independently separate systems of surface street railroads in the North and West Divisions of the City, respectively, with termini extending into the South Division. The systems of the North Street and West Street Companies, respectively, consisted in part of all the lines owned by the North City and West Division Companies, respectively, but leased by them in May 1886 and October 1887, respectively for the period of 999 years to the North Street and West Street Companies, respectively, and in part of extensions of those leased lines under grants made by the City directly to the North street and West Street Companies, respectively.

On June 1, 1899, the North Street and West Street Companies leased and conveyed, for the period of the unexpired lives of the lessor companies, respectively, and all extensions and renewals thereof, all their properties, franchises and rights (including said leased lines) to the Traction Company, which thereafter, as lessee, operated them as one system until the appointment of receivers of the Traction Company in said causes on April 22, 1903, since which time they have been operated as one system by said receivers. As lessee the Traction Company was obligated to pay or renew all notes, bonds and mortgages of said lessor companies and not only to pay the rentals payable by the North Street and West Street Companies as lessees, respectively, of the properties of the North City and West Division Companies, but also to pay as rentals to its lessors, the North Street and West Street Companies, respectively, amounts equal to dividends of 12% per annum on the capital stock of the former and of 6% per annum on the capital stock of the latter. The leases to the Traction Company further required that to secure performance of its obligations as lessee, the Traction Company should deposit such amount of

cash or security as should be agreed upon by the parties to be held subject to the conditions of a tripartite agreement by which the sum of $10,000,000 in cash or in securities approved by the North and West Street Companies, was required to be deposited; the income of the fund to be paid to the Traction Company until default in its obligations as lessee, and upon default such income and any of the principal thereunto needed to be appropriated and applied in equal and ratable payment and discharge of the debts and obligations assumed by the Traction Company. The leases to the Traction Company also provide that should stocks of corporations constitute part of the deposit, the trustee should vote them in accordance with the instruction of the Traction Company or, if requested by the Traction Company, should execute a voting proxy to the person designated from time to time by that company. Under the tripartite agreement there were deposited 20,000 shares and 32,000 shares, respectively, of the capital stock of the North Street and West Street Companies, those shares being still held by the trustee under such agreement.

The lines of the system in the North Division were owned by the North City and the North Street Companies; those in the West Division of the City were owned by the West Division, West Street, Passenger and Tunnel Companies. The cars of all these different lines reach the business district of the City in the South Division between Van Buren Street and the main channel of the Chicago River by running over the tracks of some one or more of these companies.

These companies interested in the street railway lines covered by the Ordinance have outstanding capital stock aggregating the par value of $57,-699,300, of which $49,393,800 are held by the general public and $8,305,500 were controlled by some of the companies when the above mentioned leases were made, subject to pledge as security for certain of their obligations; the beneficial interest in, and control of, such pledged stock having, under the leases, passed to the Traction Company, and in turn to its receivers.

The indebtedness of all those companies, including various bond issues with varying maturities, aggregates $28,592,126.58, exclusive of receivers' certificates which aggregate $1,982,000, making the total indebtedness $30,-575,126.58.

On April 22, 1903, the Guaranty Trust Company of New York brought three suits at law in the Circuit Court of the United States, for the Northern District of Illinois, against the North Street Company, the West Street Company and the Traction Company, respectively. On the same day the general issue was filed in each case, issue was joined, the jury duly waived and, upon trial, judgments were rendered against the respective defendants in those suits for $565,052.66, $270,440.00 and $318,690.66 respectively. Thereafter, on the same day, execution having been awarded and returned, no property found, the Guaranty Trust Company filed its three separate judgment creditor's bills in the Circuit Court of the United States, for the Northern District of Illinois, against the three judgment debtors, respectively, in each bill praying for the appointment of a receiver and in the bill against the Traction Company praying that the receivers take possession of and operate the railways. In each case the judgment debtor was the only defendant. In each case the defendant company filed its answer confessing the bill and the court forthwith appointed receivers with authority in the case of the receivers of the Traction Company to operate the property under the order of the court. The receivers of the three defendant companies forthwith qualified and the companies thereupon transferred to them respectively all their properties, rights and franchises, the receivers of the Traction Company taking possession of the property in the custody of the Traction Company as lessee.

Under an order of the court, entered July 18, 1903, the receivers filed two ancillary bills, one against the City of Chicago, the West Division Company, the Traction Company and the West Street Company; the other against the City, the Traction Company, the North Street Company and the North City Company. On appeal from the decree entered in those ancillary suits by the Circuit Court, it was decided by the Supreme Court of the United States, (Blair, et al., receivers, v. City of Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801) that the claim of the companies that they had a ninety-nine year franchise (extending to 1958) was wholly unfounded and that the fran-

chises covering the lines of the North City Company in the North Division and their termini in the South Division with the possible exception of the Wells Street line, absolutely expired in July 1903, and that the franchises covering most of the lines of the West Division Company in the West Division and their termini in the South Division expired at the same time, subject, however, as to a portion thereof, to the right of the company to continue operation until the City should purchase, at an appraised value, the tangible property used in such operation.

Of the unexpired franchises covering lines in the West Division the average life remaining after January 1, 1907, was slightly more than six years. Out of a total mileage of 306.046 miles of track the franchises for 136.44 miles had absolutely expired; the franchises for 70.35 miles were subject to be terminated at any time by the City upon six months' notice and purchase of the tangibles; and the franchises for 99.256 miles had only a short period to run. The franchises covering the trunk lines and the terminals had either absolutely expired or were subject to termination by the City on six months' notice and purchase of the tangibles.

On June 30, 1906, in the first of the above entitled causes, and on July 23, 1906, in each of the other of said above entitled causes, the Guaranty Trust Company of New York, complainant in each of those causes, filed an amended and supplemental bill making, in each case, parties defendant each and every person or corporation which had or claimed an interest in any of the property, rights or franchises of the original defendant therein. Service was had upon each defendant, and on March 2, 1907, all defendants, who had not appeared, pleaded, answered or demurred, were duly defaulted, and each of said causes was still pending in court and undetermined when the petition of the Railways Company was filed. Each of the companies, except the Tunnel Company, before enumerated as being interested in the street railway lines covered by the Ordinance filed its answer to the amended and supplemental bill in said causes, respectively. The North City Company and the West Division Company each filed in each of said causes a cross-bill asking that its rights and those of its mortgagees and stockholders be established against the North Street Company and the West Street Company, respectively, and against the Traction Company.

All said companies, by their answers, and said North City and West Division Companies, also by their cross-bills, expressly surrendered, transferred and delivered to and vested in the court all their properties, assets, franchises and rights to be administered, operated, sold, leased or otherwise dealt with or disposed of as to the court might seem meet and proper and submitted themselves and their properties, etc., to the jurisdiction of the court and undertook to abide by and carry out such orders as the court might from time to time make concerning said properties, etc., or directing or concerning the execution of any conveyance or any instrument affecting the title, lease, possession, user, delivery or custody of the same.

The amended and supplemental bill prayed, among other things, that the court appoint a receiver or receivers of the entire property, estate, interest and possession theretofore vested in the separate receivers of the Traction, North Street and West Street Companies; that such new receiver or receivers be invested with power to utilize the income and credit of the properties as a unit in order to maintain, improve and operate them as a single system; that the court marshal all the assets of said respective companies and ascertain and enforce the several and respective liens and priorities existing on each and every part of said system; that all parties to the amended and supplemental bill be required to assert their rights, claims or liens with respect to any part of said street railway system and be enjoined from enforcing any such lien in any other court, and that in the event of the failure to pay, within a time to be limited by the court, any claim or debt secured by lien upon any part of the property in the receivers' hands, the entire property to be sold in such manner as to the court might seem most effective not only to recognize the distinct and several rights of the various lienors and mortgagees against parts of said estate, but also to preserve for the general benefit the element of value arising from the association of said parts into a single system capable of maintaining the continuity of its operations as a going concern and of rea-

sonably meeting the requirements of public travel, and that the proceeds of such sale should be applied, first, to the satisfaction of the debts due to the creditors of said several corporations according to their several rights and priorities and the surplus, if any, distributed among the stockholders as the court might direct.

The Ordinance, passed February 11, 1907, as amended July 8, 1907, granted to the Railways Company for a period ending February 1, 1927, the right to construct, maintain and operate the system of street railways in all the streets in which lines of street railway were being operated by the receivers February 1, 1907, the grant containing the following conditions and provisions:

(a) A plan of reorganization and readjustment, approved by Judge P. S. Grosscup and Professor John C. Gray of Harvard College, should be promulgated by September 14, 1907, which plan should offer opportunity to every person directly or indirectly interested in said street railway system, or any part thereof, to participate in the transfer to and the acquisition thereof by the Railways Company and to participate ratably and equitably in the benefits of the new grant, provided that no right under the Ordinance should inure to the benefit of any such person except and only as he should accept and become a party to such plan.

(b) By September 14, 1907, there should be deposited with a designated depositary a specified number of shares of the capital stock of the companies interested in said street railway system, which shares with those owned by the companies and controlled by the receivers would constitute a majority of the stock of the various companies and be used in carrying out the plan of reorganization and readjustment.

(c) If by September 14, 1907, the Railways Company should be in lawful possession of said street railway system, it could then (but not otherwise) accept the Ordinance and have three years within which to perfect title to the property; and the petition of the Railways Company seeks such possession to enable it to accept the Ordinance.

(d) The Ordinance required the Railways Company forthwith to improve, reconstruct, rehabilitate, extend and equip the system in accordance with the specifications contained in the Ordinance and under the direction and certification of the Board of Supervising Engineers created by the Ordinance.

Under the Ordinance the City has the right to purchase the properties for $29,000,000, their value as appraised and fixed (for the purpose only of such purchase) plus any additions thereto between June 30, 1906, and February 1, 1907, and to take the property subject to the lien for rehabilitation, for the cost of which, plus an agreed percentage representing contractors' profit and expense of financing, the Railways Company was authorized to issue bonds, to be secured by a mortgage which, as against the City or its licensee and all persons ever having or claiming any benefit under the Ordinance, should always be a first lien upon the entire street railway system and the franchise rights granted by the Ordinance.

(e) From the gross receipts of the system there is to be deducted all expenses of operation, including maintenance, repairs and renewals ascertained by an agreed method; all amounts contributed during the year and held in reserve under sections 16 and 18 for maintenance, repairs, and personal injury claims; all taxes and assessments exclusive of City license fees; salaries and expenses of the Board of Supervising Engineers; and a sum equal to 5% per annum upon the amount of the cash purchase price which the City would be obligated to pay if it were purchasing the property for municipal operation; the balance, representing the net receipts, to be divided, the City taking 55% thereof and the Railways Company retaining 45% thereof.

(f) The Ordinance provides for a system of through routes to, from and over the lines of the City Company and the Railways Company, and a system of universal transfers as between all the lines of the two companies, except within a certain small limited territory in the congested business district.

(g) Simultaneously with the passage of the Ordinance a substantially like ordinance was passed in favor of the City Company. In each of the two ordinances there was reserved by and given to the City the right to require the grantee in that ordinance to extend its lines over the streets covered by the other ordinance in case of nonacceptance or forfeiture thereof, and to furnish

whatever money should be required to purchase the physical property upon such streets of either company so defaulting; so that if the Railways Company fails to accept the Ordinance the City may give to the City Company a franchise over all the streets covered by the Ordinance to the Railways Company if as and when any franchises covering the same have expired and may require the City Company to extend its lines over the same and to furnish all money needed to enable the City to exercise its right of purchase reserved with respect to some certain streets.

The petition of the Railways Company, after setting forth the corporate and fiscal relations to each other of the several companies interested in the Traction Company's system, and their franchise relations to the city, alleged that in view of said decision of the Supreme Court of the United States both the City Company and the Traction Company were at the mercy of the City, that it became and was necessary to obtain a renewed franchise ordinance, which the City would not grant except upon the condition that the entire surface street railway system in Chicago should be dealt with as a whole so that the City might be in a position to acquire and operate the property for the benefit of the public; that on February 11, 1907, the City Council passed, and thereafter in due time the people by vote approved the ordinances to the City Company and the Railways Company, respectively; that the City Company has accepted its ordinance; and that the Railways Company as grantee in the Ordinance submits itself to the jurisdiction of the Court for the enforcement against it on the terms and conditions therein named, of its obligations under the plan of reorganization and the deposit agreement in the Ordinance mentioned and any order made upon the petitioner and accepted by it. The petition further alleges that the specified number of shares of the stock of the various companies interested has been deposited with the depositary designated in the Ordinance; that a plan of reorganization and readjustment in accord with the requirement of the ordinance had been presented to Peter S. Grosscup and John C. Gray for their approval thereof; that the petitioner is ready and willing upon approval of said plan to consummate the same; that the petitioner's negotiations for the funds required for rehabilitation are ready to be concluded and the funds to be provided by a sale of a sufficient number of bonds authorized and secured by the rehabilitation mortgage authorized by the Ordinance as soon as the petitioner is vested with power to comply with the conditions made precedent to its right to accept the Ordinance; that it is absolutely essential to the conservation of the interests of all the parties interested in the Traction Company's system that the petitioner be invested with lawful possession of all the lines of street railway operated by the receivers of the Traction Company February 1, 1907.

The petitioner then prays "That the court by proper orders will (1) order and direct its receivers herein to surrender and deliver to it, its lessees, successors and assigns, and will invest it, with the full and lawful possession of all the lines of street railway operated by said receivers on February 1, 1907, with all the plant and equipment in use on or in connection with said lines at the time of such delivery, and (2) adjudge and decree that the petitioner has power and authority (a) to comply with the provisions of the Ordinance with respect to the operation, maintenance, extension, reconstruction, re-equipment and improvement of said railways, (b) to make from the receipts thereof all the deposits, and payments required by the provisions of the Ordinance to be made from such receipts, (c) to transfer to the city, or its licensee or nominee, all such possession, rights and powers in accordance with the provisions of the Ordinance in that behalf, (d) to execute the bonds and mortgage above referred to and to charge a first lien upon the said property and the possession thereof and otherwise, all as in said form of mortgage set forth, to the ends, for the amounts and for the purposes in said form of mortgage set forth or authorized thereby, (e) to accept the said Ordinance and to comply with each and every of the terms, conditions and provision thereof but for the use and benefit of the beneficiaries who have accepted or who may hereafter accept in accordance with and subject to the provisions thereof, the aforesaid Plan and the Agreement therein referred to, and (f) generally, and from time to time, to do each and every act and thing in and by the said Ordinance and Deposit Agreement required on its part, in order to fully and completely in-

vest it with all the rights, consent, permission, authority, grants, privileges and benefits in the Ordinance mentioned, or to follow therefrom or from any ordinance amendatory thereof or supplemental thereto, all upon such reasonable and proper terms and conditions as to the court may seem meet and proper in the premises."

Much evidence was heard in support of the allegations of the petition, but the main issue, raised by the answers filed by the trustees in various mortgages of the companies interested in said street railway system and by others, was as to the jurisdiction and power of the court to surrender or deliver possession of said street railway property to the petitioner, the Railways Company.

George W. Wickersham, L. C. Krauthoff, and Frank Hagerman, for appellee Chicago Railways Company.

GROSSCUP, Circuit Judge.    Under the bills in these cases, receivers were appointed, who, for four years now, under the direction of the court, have been operating the properties.    The history of the cases, up to April, 1906, is fully set forth in Blair v. City of Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801.    Since that time, by amended and supplemental bills and answers, the control, custody and disposition of the properties, as street railway properties, have been expressly surrendered to the court by the companies.

The petition under consideration is by the Chicago Railways Company; and it asks that the Chicago Railways Company be put in possession of the properties of the several street railway companies named, in accordance with the terms of an ordinance of the city of Chicago passed Feb. 11th, 1907; which ordinance granted to the Chicago Railways Company, for the term of twenty years from Feb. 1st, 1907, the right to construct, maintain and operate, over the streets of Chicago, a street railway covering the present lines of the Union Traction Company, lessee.

The ordinance provides that the Chicago Railways Company shall not have the right to accept it unless at the time of acceptance certain specified numbers of the shares of said Chicago Union Traction Company, North Chicago Street Railroad Company, West Chicago Street Railroad Company, North Chicago City Railway Company and Chicago West Division Railway Company shall have been deposited with a named trustee in token of approval of the ordinance, that is to say, under a deposit agreement in form substantially like the one annexed to the ordinance; and unless also, at the time of the acceptance, the Chicago Railways Company shall be in lawful possession of the lines of the Chicago Union Traction Company "with power and authority to comply with the provisions of this ordinance with respect to the operation, maintenance, extension, re-construction, re-equipment and improvement of said railways and to make from the receipts thereof all the deposits and payments required by the provisions of this ordinance to be made from such receipts, and with power to transfer to the City, or its licensee, all such possession, rights and powers in accordance with the provisions of this ordinance in that behalf hereinafter set forth." The ordinance, as amended, provides further that all rights under it shall cease and determine unless by September 14, 1907, there be

formulated a plan of re-organization and re-adjustment of the several interests involved in these lines approved by certain persons therein named,—the conception of such ordinance being that so far as possible the interests of the old companies be transplanted to the new.

The stockholders of these companies are in a situation now, under the terms of the ordinance, to accept the same; and such plan having now been approved as provided for, the question presented by the petition is, shall the properties be turned over accordingly?

No interest of any consequence, so far as I have heard (the stockholders and creditors really dissenting holding very small amounts) dispute the business necessity of the order asked. The whole discussion at the hearing, so far as it was a discussion at all, revolved about the question of power—the power of the court to do this confessedly necessary thing. On the question thus presented there are abundant analogies in the cases in the books, but nothing that can be called a precedent. And being without precedent, to be rightly judged, the peculiar facts that constitute this case must be rightly comprehended.

For the purposes of street railway operation, the city of Chicago, spreading out into the country like a fan, from the business center immediately adjacent to the lake, fell naturally into three subdivisions, the north, the west, and the south sides, respectively. In 1886 and 1887, the street railway systems on the north and west sides were still horse railways—the cars, the barns, and much of the tracks being adapted only to horse railway purposes. At that time the city had a population of over three quarters of a million; in every direction its population was pushing out; from every quarter came demands for extensions and better methods; the south side, the companion system, already had a successful cable system; and the alternative put up to the north and west side companies, including the Passenger Railway, by the very nature of their obligation to the public was, either to undertake a readjustment of their lines to the requirements of the times, or to make arrangements with others who would perfect such readjustment; for no public utility of this character can rest upon the purely private right of standing still or going forward as it may choose; the nature of the undertaking and the obligation to the public determine that it cannot stand still—that it must go ahead.

In this situation of affairs, the North Chicago City, the West Division, and the Passenger Railway chose to turn over their holdings to two new companies, the North Chicago Street Railroad, and the West Chicago Street Railroad, taking, for the future, stipulated dividends on their stock, and guaranties of their bonds and lending to the new companies the financial credit of the old, for the purposes of new bonds and other obligations; and under this arrangement, involving as it did the issue of many new securities, and followed as it was in 1899 by the consolidation of the properties in the Union Traction Company, has come the system of railroads that is now in the custody of the court, and the series

of securities that are involved in the question presented by this petition.

This system of railways, on its physical side, is different from any case in the books; for unlike the private rights of way of the steam railroads that have gotten into the courts for reorganization, the so-called rights of way of this system are mere permissive grants, that having been extended, from time to time toward the outlying districts, now present on the map the appearance of zones —in the nearer zones most of the rights already expired, and in the outer zones the rights having varying periods still to run.

Then, too, in the matter of the lien of specific securities upon specific property, this case is different from what appears ordinarily in the books; for here, as already indicated, the older properties have been almost wholly replaced by the newer, and what is left of the older is bound up with the newer, as realty and equipment, in a single united system. And parties buying the securities of such corporations, take them with imputed notice that the property covered, whether it be real estate or personalty, is part of a system—a system that in the very nature of things must continually be replacing the old with the new—adding, discarding, fusing, until in many instances the original identities are all but lost.

But marked as these differences are, they are not the chief considerations that distinguish this case from preceding cases. In nearly all the cases in the books, the right of way is a permanent right— as permanent a part of the property as a whole, as is the roadbed itself—and dependent on no negotiation from time to time with the public for renewals. Here there is no roadbed; there is no permanent right of way; there is, except in the extreme outer zones, no right of way at all. What the court as custodian of this property has from the city, is only an offer of a right of way—an offer that if accepted, will give to the property immediately, as a going concern, a value of upwards of thirty millions of dollars; but rejected, would leave the property with only its junk value, possibly not one-half the sum named. Ordinarily the presence of such a consideration would determine, by its own logic, the question of power; for it is almost unthinkable that a court of chancery, charged with the conservation of property, and exercising power therein as broad as the power of ownership itself, is powerless to accept for the owners what the owners, in the exercise of ordinary business sense, would not hesitate to accept—is powerless to accept life; but bound, by the narrow technicalities of the law, to take for its wards only a sentence of death.

But notwithstanding this there are those who oppose this motion, professing that they do not accept the facts as stated—professing a confidence that in some way these companies could succeed in holding on to the streets they now possess, though the law does not give them the right of such possession. These people, it seems to me, overlook, or seek to have the court overlook, what every man carefully seeking information in the history before the court cannot help but see. Had the history of the street railways been different from what it was; had the chief promoters, in the dispo-

sition. of the earnings, done what was at one and the same time their duty to the stockholders, and their duty to the public; had the corporation policy of Illinois not been wholly indifferent to what became of both stockholders and public after the corporate charters were issued, the outlook might be different. But that is not the history before the court. The history before the court shows a great fortune to a promoter, leaving a broken down system in the hands of those who hold the bag; the public indignant; the public determined that such a thing shall not occur again. And in the face of these facts, it seems plain enough to me that an offer more favorable to the companies, and less guarded than the one embodied in the ordinance to the Chicago Railways Company, ought never to be expected, for the sufficient reason, if there were no other, that an ordinance more favorable and less guarded ought never to be granted.

What, then, in the presence of this situation, ought the court to do on the petition presented? To obtain just such an offer as this— an offer that safeguards the public interest at the same time that it puts into the new arrangement all the interest of the old, big and little, on the basis of the old—the court, and those aiding it, have for four years now patiently waited and faithfully worked. To be able to obtain such an offer the court refused the demand of one set of stockholders that forfeitures should be declared, and the suggestion of another that the properties should go to the auction block, because, as things looked to the court, a forfeiture would be a means whereby one set of stockholders might recoup some of their losses out of the other, and to sell the properties at auction would have put it in the power of the big interests to recoup their losses out of the little. To obtain this offer the court, and those aiding it, have gone through misunderstandings, criticism—private interests not always generous or just, and public opinion not always discriminating—trying faithfully to hold the bow of the ship into the face of the storm until the storm should subside. And with this offer at last obtained, a safe port is at last in sight. Should that port be now rejected merely because no precedent can be found for the last act of piloting that is needed? To my mind conduct like that would be the suppression of good business sense— the surrender of equity, in its broadest sense and broadest power, to a possible legal fetish. I do not feel called upon, by anything yet called to my attention, to make such surrender. The situation confronting me calls much more convincingly that the court take the responsibility of creating a precedent. This is made less difficult by the fact that the order asked for will not cut off any dissenting bondholder or creditor from any of his legal rights under the mortgage or under the law—the order reserving to such bondholders or creditors, as elect to have their legal rights further than come in under this plan, full opportunity to prosecute the same, by foreclosure or otherwise, the same as if the order were not entered.

The conscience of the court satisfied that the order ought to be entered, and the judgment of the court satisfied of its power to enter the order, the form that the order shall take, whether the lawful

possession to be lodged in the petition, the Chicago Railways Company, shall be by lease, or by operating agreement, or in some other way, is only a matter of ways and means, the legitimacy of which is to be determined only by their adaptability to the purpose intended.